**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| RICK BARRINGTON, Derivatively On Behalf of Nominal Defendant BOSTON SCIENTIFIC CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>JOHN E. ABELE, KATHERINE T. BARTLETT, BRUCE L. BYRNES, NELDA J. CONNORS, J. RAYMOND ELLIOTT, MARYE ANN FOX, RAY J. GROVES, ERNEST MARIO, N.J. NICHOLAS, JR., PETE M. NICHOLAS, UWE E. REINHARDT, JOHN E. SUNUNU, SAMUEL R. LENO, JAMES R. TOBIN, URSULA M. BURNS, NANCY-ANN DEPARLE, JOEL L. FLEISHMAN, KRISTINA M. JOHNSON, JOHN E. PEPPER, WARREN B. RUDMAN,<br><br>Defendants,<br><br>- and -<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>Nominal Defendant. | Civil Action No. 1:10-cv-11054<br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, for his verified shareholder derivative complaint, by his undersigned attorneys, alleges upon personal knowledge as to himself and his acts, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought on behalf of Boston Scientific Corporation ("BSC" or the "Company"), against all of the Company's current directors, certain former directors, and certain current and former officers, seeking to remedy their intentional or

reckless breaches of their fiduciary duties that caused substantial losses to the Company beginning on April 20, 2009, through March 12, 2010 (the "Relevant Period"). Plaintiff's allegations are made upon information and belief based on the investigation of his counsel (except as to the allegations in paragraph 7 below, which Plaintiff makes on personal knowledge), which included, among other things, the complaint in the pending federal securities fraud class action captioned *City of Roseville Employees' Ret. Sys. v. Boston Scientific Corp.*, No. 1:10-cv-10593 (PBS) (D. Mass.) (the "Securities Fraud Action"), the Company's public filings with the United States Securities and Exchange Commission ("SEC"), analyst reports, press releases, and other publicly available documents and information.

## OVERVIEW

2. As alleged in more detail below, in contrast to the Company's previously positive statements about its Cardiac Rhythm Management ("CRM") business during the Relevant Period, on October 19, 2009, the Company disclosed relatively small growth in domestic sales, triggering a 15% decline in the price of its stock. On February 10, 2010, the Company stated that it could lose up to $100 million in CRM sales because of the termination of CRM sales staff. This news caused another 10% drop in the price of the Company's shares. The same day, the Company publicly defended allegations published in a respected medical journal that one of its CRM products was defective. The final blow came on March 15, 2010, before the market opened, when the Company announced that it was suspending all sales of its implantable cardiac defibrillator ("ICD") products, the mainstay of its CRM line, and recalling all previously shipped ICD products. BSC's shares dropped another 12.6% on this news. The complaint in the Securities Fraud Action was filed after these revelations.

3. These developments were not the result of bad judgment, unforeseeable events, or the vicissitude of business cycles. Rather, they resulted proximately from the Individual Defendants' (as defined herein) approval of and/or acquiescence in and/or intentional and/or reckless failure to monitor and prevent a course of systemic and sustained misconduct that allowed the Company, during the Relevant Period, to: market and sell CRM products using illegal and unethical business practices; manufacture, market, and sell defective ICD products; manufacture, market, and sell ICD products using unapproved manufacturing procedures; and conceal these problems from investors. BSC and the Individual Defendants knew or should have known about these risks but ignored them with catastrophic financial results to the Company.

4. There is a *qui tam* action, *United States ex rel. Bennett v. Boston Scientific Corp.*, C.A. No. 4:07-cv-2467 (S.D. Tex.) and a related derivative action, *Lin v. Tobin*, No. 10-1071 (Mass. Sup. Ct.), currently pending alleging violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*, resulting from the Company's improper marketing of its microwave surgical ablation system, a CRM product, for the off-label use of treating atrial fibrillation. In addition, a federal court recently rejected a plea agreement between the entity BSC purchased in 2006 to establish its CRM product line and the United States Department of Justice ("DOJ") involving guilty pleas to two misdemeanor counts of violating the Food, Drug, and Cosmetic Act ("FDCA") and agreement to pay a criminal fine of $253,962,251 and a criminal forfeiture of $42,079,675 because, among other reasons, the plea agreement did not contain a term of probation for BSC or require it to perform community service. *United States v. Guidant LLC*, Crim. No. 10-mj-67 (DWF), 2010 U.S. Dist. LEXIS 40994 (D. Minn. Apr. 27, 2010).

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

6. Venue is proper in this District pursuant to 28 U.S.C. §1391 because, among other things, the principal place of business of nominal defendant BSC is located within this District and because many of the acts forming the basis for this action occurred in this District.

## PARTIES

### Plaintiff

7. Plaintiff is, and was at all times during the Relevant Period, a shareholder of BSC. Plaintiff brings this action derivatively in the right of and for the benefit of BSC. Plaintiff will fairly and adequately represent the interests of BSC and the shareholders of BSC in enforcing the rights of the Company. Plaintiff is a resident of Arkansas.

### Nominal Defendant

8. Nominal Defendant BSC is a Delaware corporation with its principal executive office located at One Boston Scientific Place, Natick, Massachusetts 01760. According to its Form 10-K filed with the SEC on February 26, 2010, BSC "is a worldwide developer, manufacturer and marketer of medical devices that are used in a broad range of interventional medical specialties including cardiac rhythm management, electrophysiology, interventional cardiology, peripheral interventions, neurovascular, endoscopy, urology, women's health and neuromodulation." BSC stock is traded on the New York Stock Exchange ("NYSE") under the symbol "BSX." Its net sales for 2009 were approximately $8.2 billion.

**Current Director Defendants**

9. Defendant John E. Abele ("Abele") is a co-founder of the Company and has served as a director since 1979. Additionally, Abele was the Company's Treasurer from 1979 until 1992, Co-Chairman from 1979 until 1995, and Vice Chairman and Founder, Office of the Chairman from February 1995 until March 1996. Upon information and belief, Abele is a resident of Vermont.

10. Defendant Katharine T. Bartlett ("Bartlett") has been a director of BSC since August 2009. She is a member of the Executive Compensation & Human Resources Committee. Upon information and belief, Bartlett is a resident of North Carloina.

11. Defendant Bruce L. Byrnes ("Byrnes") has been a director of BSC since August 2009. He is a member of the Audit Committee and the Finance Committee. Upon information and belief, Byrnes is a resident of Ohio.

12. Defendant Nelda J. Connors ("Connors") has been a director of BSC since December 2009. She is a member of the Compliance and Quality ("CQ") Committee and the Finance Committee. Upon information and belief, Connors is a resident of Illinois.

13. Defendant J. Raymond Elliott ("Elliott") was a member of BSC's Board of Directors throughout the Relevant Period. Beginning on July 13, 2009, Elliott became the President and CEO of BSC. Elliott is a named defendant in the Securities Fraud Action. Upon information and belief, Elliott is a resident of Massachusetts.

14. Defendant Marye Anne Fox ("Fox") has served as a director of BSC since 2001. Fox is a member of the CQ Committee and the Finance Committee. Upon information and belief, Fox is a resident of California.

15. Defendant Ray J. Groves ("Groves") has served as a director of BSC since 1999. Groves is Chairperson of the Nominating & Governance Committee, and is a member of the Executive Compensation & Human Resources Committee. Upon information and belief, Groves is a resident of Connecticut.

16. Defendant Ernest Mario ("Mario") has served as a director of BSC since 2001. Mario is Chairperson of the CQ Committee, and is a member of the Audit Committee and the Executive Compensation & Human Resources Committee. Upon information and belief, Mario is a resident of Pennsylvania.

17. Defendant N.J. Nicholas, Jr. ("N.J. Nicholas") has served as a director of BSC since 1994. N.J. Nicholas is Chairperson of the Finance Committee. He is the brother of Defendant Pete M. Nicholas. Upon information and belief, N.J. Nicholas is a resident of New York.

18. Defendant Pete M. Nicholas ("P.M. Nicholas") has served as Chairman of the Board since 1995, and has been a director of BSC since 1979. P.M. Nicholas served as the Company's CEO from 1979 to 1999 and as Co-Chairman of the Board from 1979 to 1995. He is the brother of Defendant N.J. Nicholas. Upon information and belief, P.M. Nicholas is a resident of Massachusetts.

19. Defendant Uwe E. Reinhardt ("Reinhardt") has served as a director of BSC since 2002. Reinhardt is Chairperson of the Audit Committee, and a member of the CQ Committee. Upon information and belief, Reinhardt is a resident of New Jersey.

20. Defendant John E. Sununu has been a director of BSC since April 2009. He is a member of the Nominating & Governance Committee and the CQ Committee. Upon information and belief, Sununu is a resident of New Hampshire.

**Current Officer Defendant**

21. Defendant Samuel R. Leno ("Leno") was, at relevant times, Executive Vice President, Financial and Information Systems, and Chief Financial Officer of BSC. As BSC's CFO and principal financial and accounting officer, Leno's responsibilities included evaluating the effectiveness of disclosure controls and procedures required for preparing reports to be filed with the SEC. Leno reviewed, controlled, and certified the contents of the Company's Form 10-K and financial press releases issued during the Relevant Period. Leno is a named defendant in the Securities Fraud Action. Upon information and belief, Leno is a resident of Massachusetts.

**Former Director Defendants**

22. Defendant James R. Tobin ("Tobin") was the President and CEO and a director of BSC until July 13, 2009. From July 13, 2009 to November 30, 2009, Tobin remained employed as a Senior Advisor to the Company. Tobin is a named defendant in the Securities Fraud Action. Upon information and belief, Tobin is a resident of Massachusetts.

23. Defendant Ursula M. Burns ("Burns") served as a director of BSC from 2002 until May 2009. Burns was Chairperson of the CQ Committee. Upon information and belief, Burns is a resident of New York.

24. Defendant Nancy-Ann DeParle ("DeParle") served as a director of BSC from 2006 until 2009. DeParle was a member of the Nominating & Governance Committee, the Executive Compensation and Human Resources Committee, and the CQ Committee. Upon information and belief, DeParle is a resident of Maryland.

25. Defendant Joel L. Fleishman ("Fleishman") served as a Director of BSC from 1992 until 2009. Fleishman was a member of the Audit Committee, the Nominating &

Corporate Governance Committee, and the Committee on Legal Affairs. Upon information and belief, Fleishman is a resident of North Carolina.

26. Defendant Kristina M. Johnson ("Johnson") served as a director of BSC from 2006 until May 2009. Johnson was a member of the Executive Compensation & Human Resources Committee, the Finance Committee and the Committee on Legal Affairs. Upon information and belief, Johnson is a resident of Maryland.

27. Defendant John E. Pepper ("Pepper") served as a director of BSC from 2003 until May 11, 2010. Additionally, Pepper served as a director of the Company from November 1999 to May 2001. Pepper was Chairperson of the Executive Compensation & Human Resources Committee and a member of the Nominating & Governance Committee. Upon information and belief, Pepper is a resident of Ohio.

28. Defendant Warren B. Rudman ("Rudman") served as a director of BSC from 1999 until May 11, 2010. Rudman was a member of the Executive Compensation & Human Resources Committee. Upon information and belief, Rudman is a resident of New Hampshire.

29. The defendants referred to in paragraphs 9-20 are collectively referred to hereinafter as the "Current Director Defendants."

30. The defendants referred to in paragraphs 9-28 are collectively referred to hereinafter as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

31. The Individual Defendants, because of their positions of control and authority as directors or officers of BSC, were able to and did, directly and indirectly, control or fail to control the wrongful acts complained of herein. Because of their directorial and executive positions with BSC, each of the Individual Defendants had access to adverse non-public

information about the financial condition and operations of BSC, including, without limitation, the misconduct of the other Individual Defendants.

32. At all material times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of BSC, and was at all times acting within the course and scope of said agency.

33. To discharge their duties, the officers and directors of BSC were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial, business, and corporate affairs of the Company. By virtue of such duties, the officers and directors of BSC were required, among other things, to:

a. Manage, conduct, supervise and direct the business affairs of BSC in accordance with the laws of the United States, the states in which it conducted business, and BSC's charter and bylaws;

b. Implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors and employees of BSC from violating or acting in contravention to all applicable federal and state laws, rules and regulations; and

c. Refrain from using their status as directors or officers to the detriment of the Company and its shareholders.

34. Certain Current Director Defendants and Individual Defendants assumed additional fiduciary duties in connection with their service on the Board's Audit Committee, duties which they were required to exercise with loyalty and in good faith. According to its charter, the Audit Committee's purpose includes "assisting the Board's oversight of (1) the quality and integrity of the Company's financial reporting process, financial statements and

related disclosure, (2) the Company's compliance with legal and regulatory requirements, [and (3) the Company's ethics and integrity programs." The Audit Committee members are required to, among other things, "review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations,' before the filing of the Company's reports on Form 10-K and Form 10-Q;" "discuss generally the type of information to be disclosed, and the type of presentation to be made, in earnings press releases . . . as well as the type of information to be disclosed, and the type of presentation to be made, in any financial information and earnings guidance provided to analysts and rating agencies;" "prepare the report required by the [SEC] to be included in the Company's annual proxy statement;" "monitor adherence to established corporate policies, codes and practices, including such matters as conflicts of interest, questionable payments and standards of business conduct;" "arrange for any special investigations or audits that may be deemed necessary;" and "monitor compliance with the Company's Code of Conduct, including reviewing with the general counsel the adequacy and effectiveness of the Company's procedures to ensure proper compliance."

35. As alleged herein, each of the past and current members of the Audit Committee violated their duties as members of that committee in that they utterly failed to implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors and employees of BSC from violating or acting in contravention to applicable laws, rules and regulations and/or intentionally and/or recklessly failed to detect and/or encouraged and/or aided and abetted misconduct by the Individual Defendants and the officers and employees of BSC. They also drafted, produced, reviewed, and/or disseminated the

material false and misleading statements and information alleged herein and/or were aware, or should have been aware, or recklessly disregarded, that material false and misleading statements were being issued regarding the Company during the Relevant Period.

36. Certain Current Director Defendants and Individual Defendants assumed additional fiduciary duties in connection with their service on the Board's CQ Committee. According to its charter, the purpose of the CQ Committee is to "to oversee and evaluate: (i) the Company's compliance and quality control systems and initiatives; (ii) the systems in place to maintain, and identify deviations from, the Company's compliance and quality control standards; and (iii) the Company's efforts to meet or exceed its compliance and quality control standards." Its members are required to, among other things, "monitor and evaluate the Company's compliance and quality control systems and initiatives;" "review and discuss with senior management the adequacy and effectiveness of the Company's compliance and quality control systems and initiatives, and consider recommendations for improvement thereof;" "receive reports from senior management summarizing material: (a) deviations from the Company's compliance and quality control standards; (b) product inquiry reports; (c) field action decisions; (d) corrective and preventative actions; (e) results of FDA inspections or notified body audits; (f) late complaint reporting; (g) product recalls; and (h) other matters deemed relevant by the Committee;" and "receive reports from senior management summarizing quality compliance-related activities undertaken by the Company and the results of quality compliance audits conducted." As alleged herein, each of the past and current members of the CQ Committee violated their duties as members of the Committee in that they utterly failed to implement and oversee in good faith, and with loyalty, adequate quality controls sufficient to monitor and prevent the officers, directors and employees of BSC from violating or acting in contravention to

applicable laws, rules and regulations and/or intentionally and/or recklessly failed to detect and/or encouraged and/or aided and abetted misconduct by the Individual Defendants and the officers and employees of BSC.

37. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to them in connection therewith.

38. As officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE during the Relevant Period, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty promptly to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

39. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports, press releases, and other

communications complained of herein and were aware of, or deliberately or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of, or deliberately or recklessly disregarded, their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with BSC, each of the Individual Defendants had access to the adverse undisclosed information about BSC's business prospects and financial condition and performance as particularized herein and knew or should have known or recklessly disregarded, that these adverse facts rendered the positive representations made by or about BSC and its business issued or adopted by the Company materially false and misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

40. BSC is a worldwide developer, manufacturer and marketer of medical devices, including products that focus on the treatment of cardiac arrhythmias and heart failure. Most of BSC's CRM products are implantable cardiac defibrillator ICD systems, which are a type of CRM product used to detect and treat abnormally fast heart rhythms (tachycardia). These include implantable cardiac resynchronization therapy defibrillator ("CRT-D") systems used to treat heart failure, and implantable pacemaker systems used to manage slow or irregular heart rhythms (bradycardia). BSC's entry into the CRM market resulted primarily from its 2006 acquisition of Guidant Corp. ("Guidant"). ICD systems are the largest contributor to CRM sales, accounting for approximately 70% of that segment's sales in each of the years since Guidant was acquired.

41. The day on which BSC made its initial offer to acquire Guidant, January 8, 2006, it issued a press release claiming that combined company "sales are expected to grow at a double-digit rate achieving $16 billion in sales in 2011. Adjusted EPS is expected to be between

$1.50 and $1.66 in 2007 and $1.98 and $2.18 in 2008." These results did not materialize. BSC immediately experienced problems with Guidant after acquiring the company on April 21, 2006. The issues have continued to the extent that on March 17, 2010, bestcashcow.com called the acquisition "The Worst Merger Ever," outdoing *Fortune's* claim on October 16, 2006, that it was merely "The (Second) Worst Deal Ever" after the AOL/Time Warner merger. Part of the basis for the claim by bestcashcow.com was that the combined market cap of BSC and Guidant had declined by 80% in four years.

42. On September 21, 2006, BSC issued a profit warning stating, among other things, "[p]reliminary worldwide sales of our cardiac rhythm management (CRM) business are estimated to range between $420 million and $450 million, of which between $210 million and $230 million are estimated to be U.S. implantable cardioverter defibrillator (ICD) sales. During the quarter we believe the overall CRM market experienced some contraction, which is reflected in our results."

43. BSC never realized the expectations it set when it announced its bid to acquire Guidant that combined company "sales are expected to grow at a double-digit rate achieving $16 billion in sales in 2011. Adjusted EPS is expected to be between $1.50 and $1.66 in 2007 and $1.98 and $2.18 in 2008." Actual adjusted EPS was just $0.77 for 2007, barely half of the projected amount, and $0.81 for 2008, approximately 40% of the projected amount. The anticipated double-digit growth never materialized, as BSC reported net sales of $8.4 billion in 2007, which dropped to $8.1 billion in 2008. At the end of 2008, BSC was forced to write down $2.7 billion of goodwill associated with the Guidant acquisition.

44. BSC's CRM fortunes appeared to improve beginning in 2008 notwithstanding the massive write-down of good will. The Company reported in its Form 10-Q for 2Q08 that "U.S.

sales of ICD systems for the second quarter of 2008 increased $23 million, or nine percent, as compared to the second quarter of 2007. In addition, U.S. sales of our pacemaker systems for the second quarter of 2008 increased $9 million, or 11 percent, as compared to the second quarter of 2007." Double digit growth in CRM products was also reported in its Form 10-Q for 3Q08: "Our U.S. sales of CRM products for the third quarter of 2008 increased $34 million, or 10 percent, as compared to the third quarter of 2007. Our U.S. sales benefited from growth in the U.S. CRM market and from the successful launch of our next-generation COGNIS™ cardiac resynchronization therapy defibrillator (CRT-D) and TELIGEN™ ICD systems in August, as well as the launches of our CONFIENT™ ICD system, the LIVIAN CRT-D system, and the ALTRUA™ family of pacemaker systems earlier in the year. Our international ICD system sales increased $21 million, or 19 percent, in the third quarter of 2008, as compared to the third quarter of 2007, due primarily to an increase in the size of the international ICD market."

45. In a press release issued on January 28, 2009, the Company stated that it had achieved a "third consecutive quarter of double-digit sales growth" in CRM products. Individual Defendant Tobin stated in the press release that the massive "write-down in no way diminishes our confidence in our CRM business. CRM is growing, it is taking market share, and it will be a key driver of the Company's sales and earnings growth going forward."

46. Individual Defendant Tobin reiterated his confidence in the strength of the Company's CRM business in a conference call held with investors and analysts held on January 29, 2009, the day after the press release:

> As [Individual Defendant] Sam [Leno] detailed, we delivered steady overall growth in Q4 CRM sales, due mainly to strong US defib sales on the heels of our COGNIS and TELIGEN launches. Q4 marked the third consecutive quarter of double-digit sales growth in our US CRM business. We've pulled back into a virtual – pulled into a virtual tie with St. Jude [Medical, Inc.] in the US and we expect to continue our comeback based on new product momentum. For the full

> year, we achieved the highest worldwide defib revenue since 2004, while improving our overall market share position by over 500 basis points. At this time last year, I said that success in CRM in 2008 would depend largely on our ability to leverage our quality improvements, execute on our product launches, and lead with our latitude strategy. I'm pleased to be able to say we achieved all of these goals and we begin 2009 with our CRM business in a much stronger position.

47. On March 12, 2009, the Company announced that Moody's had raised the Company's rating outlook to stable from negative, upgraded the Company's U.S. public bond rating to Ba1 from Ba2 and its liquidity rating to SGL-2 from SGL3, while affirming its corporate credit rating at Ba1, based in part on the Company's "generally steady market share" for CRM products. The press release quoted Diana Lee, a Senior Credit Officer at Moody's, as stating "Boston Scientific has demonstrated solid financial discipline, highlighted by a focus on debt repayment and cost-cutting measures. Combined with relieving potential liquidity constraints through an amended bank facility, steady positioning in these key markets helps support a stable outlook." Individual Defendant Leno added that "[t]he Moody's actions reflect the progress we are making in strengthening our financial fundamentals and driving profitable sales growth. We plan to build on this progress while continuing to focus on improving free cash flow, debt repayment and financial discipline."

48. On March 25, 2009, the Company announced that S&P had raised the Company's rating outlook to positive from negative and affirmed the Company's corporate credit rating at BB+, again based in part on "prospects for (at a minimum) modest growth in cardiac rhythm management devices given recent, new product launches." "We are pleased with the outlook upgrades by both Standard and Poor's and Moody's, which acknowledge the strengthening of our financial fundamentals, the improvements in our businesses, as well as the prospects and the progress we are making in driving profitable sale growth," Individual Defendant Leno was quoted as saying in the March 25, 2009 press release. "We will continue to focus on

strengthening our profit margins, free cash flow, debt repayment and financial discipline."

**<u>Materially False and Misleading Statements and Omissions By the Individual Defendants During the Relevant Period</u>**

49. On April 20, 2009, the Company issued a press release entitled "Boston Scientific Announces Results for First Quarter Ended March 31, 2009," which included the following assertions:

> First Quarter Highlights (Sales growth rates are constant currency):
>
> - Achieved sales of $2.010 billion and adjusted EPS of $0.19, both in line with guidance (GAAP loss per share of $0.01)
> - *Increased worldwide sales of cardiac rhythm management (CRM) products nine percent, including a 13 percent increase in implantable cardioverter defibrillator (ICD) sales*
> - *Increased U.S. CRM sales 11 percent, including a 14 percent increase in ICD sales, the fourth consecutive quarter of double-digit U.S. CRM growth*
> - Expanded worldwide drug-eluting stent (DES) leadership to 44 percent market share; increased U.S. market share to 50 percent: 27 percent TAXUS®, 23 percent PROMUS®
> - Successfully launched the next-generation TAXUS® Liberte® Paclitaxel-Eluting Coronary Stent System in Japan, achieved 54 percent market share
> - Increased worldwide Endoscopy sales six percent, Urology/Gynecology seven percent and Neuromodulation nine percent
> - Received rating outlook upgrades from Moody's and Standard and Poor's

Individual Defendant Tobin commented that "[w]e're off to a good start on the year with four percent sales growth, excluding divestitures, on a constant currency basis and adjusted EPS at the high end of our guidance range. *Our CRM and DES results were particularly impressive, with double-digit U.S. growth in both businesses.* We also saw continued solid performances by our Endoscopy, Urology/Gynecology and Neuromodulation businesses. We further reduced risk by

settling additional litigation, pre-paying debt, amending our credit facility, and maintaining financial discipline and strong cash flow."

* * *

Worldwide sales of the Company's CRM products for the first quarter were as follows:

| *(in millions)* | U.S. | | International | | Worldwide | |
|---|---|---|---|---|---|---|
| | Q1 2009 | Q1 2008 | Q1 2009 | Q1 2008 | Q1 2009 | Q1 2008 |
| ICD systems | $ 312 | $ 274 | $ 132 | $ 137 | $ 444 | $ 411 |
| Pacemaker systems | 84 | 82 | 61 | 72 | 145 | 154 |
| Total CRM products | $ 396 | $ 356 | $ 193 | $ 209 | $ 589 | $ 565 |

50. The Company's Guidance for the Second Quarter and the Full Year 2009 in the April 20, 2009, press release was:

> The Company estimates net sales for the second quarter of 2009 of between $1.960 billion and $2.080 billion, which includes an estimated $100 million negative impact from foreign currency exchange as compared to the second quarter of 2008. Excluding the impact of foreign currency and sales from divested businesses, the Company estimates net sales growth rates of three percent to nine percent during the second quarter of 2009. Adjusted earnings, excluding acquisition-, divestiture-, litigation- and restructuring-related charges; and amortization expense, are estimated to range between $0.16 and $0.21 per share. The Company estimates net income on a GAAP basis of between $0.07 and $0.13 per share.
>
> The Company reaffirms its net sales estimate for the full year of 2009 of between $8.0 billion and $8.5 billion. The Company also continues to expect adjusted earnings, excluding acquisition-, divestiture-, litigation- and restructuring-related charges; discrete tax items, and amortization expense, for the full year of between $0.80 and $0.90 per share. The Company now expects net income on a GAAP basis of between $0.46 and $0.57 per share, as a result of first quarter litigation-related charges and discrete tax items.

Individual Defendant Tobin weighed in that "[t]his guidance reflects our optimism about the growth potential of all our businesses, which are benefiting from our renewed focus on product development and increasing profitability. Our momentum is building, and we are particularly

enthusiastic about our prospects for the second half of the year, which we believe will contribute to a very strong 2009."

51. The next day, April 21, 2009, Individual Defendants Tobin and Leno participated in a conference call with investors and analysts to discuss the previous day's press release. Individual Defendant Leno said that the Company's first quarter "results were highlighted by outstanding performance in our CRM division." He stated the Company "continued to see very good progress" in the CRM business after "the launch of our COGNIS and TELIGEN platforms worldwide, excluding Japan, during the third quarter of 2008, and [was] seeing solid growth in all markets where we have launched these products." Individual Defendant Tobin then said:

> Let me move to the non-financial aspects of the business, starting with CRM, and then share my overall perspective on the quarter. *First-quarter results for CRM showed continued momentum from our new product introductions, particularly COGNIS and TELIGEN. As [Individual Defendant] Sam [Leno] detailed, we delivered steady growth in CRM revenues, due mainly to the strength of our US defib sales, which grew at 14%. This marks the fourth consecutive quarter of double-digit sales growth in our US CRM business.* While international defib sales were down slightly year over year, they were up 11% on a constant currency basis. While difficult to confirm until all competitors have reported, we believe that the strong sales growth in both the US and international defib markets will ultimately represent continued defib share gains.
>
> Additionally, we anticipate even stronger international performances when we begin to roll out our latitude patient management system in Europe during Q2. *Overall, CRM sales for the quarter, both worldwide and in the US were at their highest levels since we purchased Guidant three years ago today. We have accomplished a great deal in that time. We've turned CRM into the major growth engine that we envisioned, while significantly diversifying our product mix.*
>
> * * *
>
> As I said, today marks the three year anniversary of the Guidant acquisition. Our two biggest objectives with this purchase were diversion and growth, and we have achieved both. We now have a much more balanced product portfolio, and *CRM is expected to be the primary driver of our growth this year. It was not easy getting here. This is a renewed and revitalized business. In the process, we kept the best of what Guidant offered: its people, its ability to innovate, and its clinical science, but we completely transformed other areas, like quality, our ability to*

> *deliver a pipeline, and our latitude strategy. 2009 will be the first full year we benefit from these significant investments. This market is still underpenetrated. I believe we are now the best positioned company to take advantage of the improving dynamics of the CRM market*.
>
> * * *
>
> I'm going to close by reiterating a point I made earlier. Today is the third anniversary of our acquisition of Guidant. Seems more like 10. The Q1 numbers are the latest indication that this acquisition is providing us the growth and diversification we've always believed it would. In addition to four consecutive quarters of double-digit CRM growth, we are increasing our lead in the DES market, thanks in part to PROMUS, which also came to us from the Guidant deal. There is something else in the Q1 numbers that bears calling out. CRM had a very good quarter, not only in sales but in profitability.
>
> In addition to all that CRM has accomplished in the past three years, they have also significantly improved their profitability. This has basically filled the hole created by the introduction of PROMUS to our DES mix. CD has done a magnificent job of maintaining total market share, but PROMUS is less profitable than TAXUS. CRM has stepped in and picked up the slack, and in doing so they are making a major contribution. So we're off to a good start in Q1. We have one more quarter of tough comparisons to last year, but then *you're going to see a great Q3 and an even greater Q4. Our momentum is building* and we're optimistic about the growth potential for all our businesses, which are benefiting from our renewed focus on product development and profitable sales growth.

(Emphasis added).

52. On May 19, 2009, BSC issued a press release entitled "Fitch Raises Boston Scientific's Rating Outlook to Positive," which included the following statements:

> Fitch Ratings has raised the Company's rating outlook to positive from stable, while affirming the Company's corporate credit rating at BB+.
>
> Fitch said the revised rating outlook reflects:
>
> - The success the Company has had in stabilizing its drug-eluting stent (DES) business and *returning its cardiac rhythm management (CRM) business to growth, which has included the launch of a number of new DES and CRM products*. Fitch noted that the Company's other businesses have been performing well.
> - The Company's restructuring program, which is nearly completed and is expected to provide a lower cost structure going forward.
> - The Company's paying down approximately $1.3 billion in debt during

the last four quarters.

- The Company's research and development efforts, which are expected to provide a relatively steady stream of new product introductions across Boston Scientific's entire business.

(Emphasis added). Individual Defendant Leno commented that *"[t]he Fitch upgrade is further testimony to the progress we are making in strengthening our financial fundamentals and driving profitable sales growth*. It comes as additional welcome news after the March upgrades from Moody's and Standard and Poor's. We will continue working to improve our profit margins, free cash flow, debt repayment and financial discipline."

53. On June 25, 2009, the Company announced that three days earlier, the Board had accepted the resignation of Individual Defendant Tobin as President, Chief Executive Officer, as a member of the Executive Committee, and as a member of the Board effective as of July 13, 2009, at which time Tobin would become a Senior Advisor through November 30, 2009. Current Director Defendant Elliott was appointed to replace him in all of these capacities.

54. On July 20, 2009, the Company issued a press release entitled "Boston Scientific Announces Results for Second Quarter Ended June 30, 2009," which included the following assertions:

Second quarter highlights (Sales growth rates are constant currency):

- Increased sales seven percent to $2.074 billion and achieved adjusted EPS of $0.20, both at the high end of the Company's guidance range (GAAP EPS of $0.10)

- *Increased worldwide sales of cardiac rhythm management (CRM) products 10 percent, including a 13 percent increase in implantable cardioverter defibrillator (ICD) sales*

- Increased worldwide sales of drug-eluting stent (DES) systems 14 percent

- Maintained leadership position in worldwide DES market, including a 50 percent share of the U.S. market

- Increased worldwide Neuromodulation sales 18 percent

- Increased worldwide Endoscopy sales six percent, Urology/Gynecology seven percent

(Emphasis added). Current Director Defendant Elliott weighed in that "I am excited about joining the Boston Scientific team and to help report a very good quarter. We delivered sales and earnings at the high end of our guidance range with almost all businesses and regions reporting solid results. *The performance of our two largest businesses was particularly impressive*, with Cardiovascular achieving mid-teens growth in DES sales and *CRM recording its fifth consecutive quarter of double-digit growth in the U.S.*"

* * *

Worldwide sales of the Company's CRM products for the second quarter – on a reported basis – were as follows:

| *(in millions)* | U.S. | | International | | Worldwide | |
|---|---|---|---|---|---|---|
| | Q2 2009 | Q2 2008 | Q2 2009 | Q2 2008 | Q2 2009 | Q2 2008 |
| ICD systems | $ 315 | $ 276 | $ 139 | $ 144 | $ 454 | $ 420 |
| Pacemaker systems | 90 | 88 | 65 | 70 | 155 | 158 |
| Total CRM products | $ 405 | $ 364 | $ 204 | $ 214 | $ 609 | $ 578 |

55. The Company's Guidance for the Third Quarter and the Full Year 2009 in the July 20, 2009, press release was:

> The Company estimates net sales for the third quarter of 2009 of between $2.0 billion and $2.1 billion. Adjusted earnings, excluding intangible asset impairment charges; acquisition-, divestiture-, litigation- and restructuring-related charges; and amortization expense, are estimated to range between $0.17 and $0.21 per share. The Company estimates net income on a GAAP basis of between $0.08 and $0.13 per share.
>
> *The Company has updated its net sales estimate for the full year of 2009 to between $8.1 billion and $8.4 billion.* The Company expects adjusted earnings, excluding intangible asset impairment charges; acquisition-, divestiture-, litigation- and restructuring-related charges; discrete tax items, and amortization

> expense, for the full year of between $0.82 and $0.86 per share. The Company expects net income on a GAAP basis of between $0.47 and $0.53 per share.

(Emphasis added).

56. The next day, July 21, 2009, Current Director Defendant Elliott and Individual Defendant Leno participated in a conference call with investors and analysts to discuss the previous day's press release. Leno said that the just-announced "results were highlighted by outstanding performance across most of our businesses," including "impressive growth in our CRM division," which reported "the fifth consecutive quarter of double-digit year-over-year growth." Elliott then stated:

> I want to acknowledge the excellent work done by thousands of CRM employees over the past few years. *They have revitalized this business from top to bottom, transforming quality, realigning R&D priorities, and developing a pipeline capable of impressive results. Our CRM business is in solid shape today thanks to their efforts*. Second quarter results show continued positive momentum from our recent product introductions, particularly COGNIS and TELIGEN. As [Individual Defendant] Sam [Leno] said, *we have delivered steady overall growth in CRM revenues, due mainly to the strength of our US defib sales, which grew at 14% for the second straight quarter. This is more importantly the fifth consecutive quarter of double-digit sales growth in our US CRM business.*
>
> We also saw the highest US pacer revenue in four years, supported by the growing adoption of our advanced ALTRUA platform. International defib sales were up double-digit as well at 10% on a constant currency basis, and we anticipate accelerating international performance in the second half of the year, as we begin to roll out our LATITUDE patient management system in Europe, happening as we speak.
>
> *CRM sales this quarter, both worldwide and in the US, were at their highest level since we purchased Guidant. It's also important to note that our CRM business reported sequential quarterly growth across every major product segment, both worldwide and in the US*. While de novo implantations in the US market have been flat to down since 2006, replacement[s] have increased by more than 30% per year. *We expect to sustain these positive trends on the strength of our new products, which remain on track to generate* ***an amazing two thirds of CRM sales in 2009****. COGNIS and TELIGEN, the world's smallest and thinnest high energy devices, achieved 100% full field inventory levels during the quarter. Importantly, up from only 70% in the first quarter. They continue to be very well received. Since their recent launch, we believe that we have gained almost 3 share points in the US.*

* * *

> Let's begin with what we liked about the quarter. Number one, *solid and diversified sales performance across almost all products and geographic segments. 7% growth despite worldwide recession and strong product competition with the associated price pressure. I can see no reason at this point in time to alter our 2010 and 2011 aspirations of 5% to 7% constant currency sales growth.* ***My confidence in no small part is based on what I believe is the finest, and clearly on a per person basis, the most productive salesforces in the business.*** We just need more of them.

(Emphasis added).

57. On October 19, 2009, the Company issued a press release entitled "Boston Scientific Announces Results for Third Quarter Ended September 30, 2009," which included the following assertions:

> Third quarter highlights (Sales growth rates are constant currency):
>
> - Increased sales three percent to $2.025 billion and achieved adjusted EPS of $0.19, both within the Company's guidance ranges
> - Reported GAAP EPS of $0.13, at the high end of the Company's range
> - Maintained leadership position in the worldwide drug-eluting stent (DES) market with a 41 percent share, including a 49 percent share of the U.S. market and a 47 percent share of the Japanese market
> - *Increased worldwide cardiac rhythm management (CRM) product sales eight percent*
> - Increased worldwide Endosurgery sales eight percent, including a 10 percent increase in Endoscopy sales
> - Increased worldwide Neuromodulation sales 21 percent
> - Prepaid $225 million of term loan debt
> - Settled 14 outstanding patent litigation matters with Johnson & Johnson

(Emphasis added). Current Director Defendant Elliott said "So far this year, *CRM market growth has not been as strong as expected, but our CRM business has continued to grow,* and we

have not seen the slowdown in hospital stocking described by St. Jude." He also noted that "[t]he quarter was marked by significant clinical accomplishments. . . . We announced final results from the MADIT-CRT trial, which clearly demonstrated that CRT-D therapy slows the progression of heart failure. . . . We also obtained key product approvals, including CE Mark for the LATITUDE Patient Management System [a remote monitoring system for ICD and CRT-D devices]. . . . These developments are further evidence of the strength and promise of our CRM . . . business[]."

* * *

| *(in millions)* | U.S. | | International | | Worldwide | |
|---|---|---|---|---|---|---|
| | Q3 2009 | Q3 2008 | Q3 2009 | Q3 2008 | Q3 2009 | Q3 2008 |
| ICD systems | $ 314 | $ 291 | $ 131 | $ 132 | $ 445 | $ 423 |
| Pacemaker systems | 90 | 86 | 73 | 63 | 163 | 149 |
| | 404 | 377 | 204 | 195 | 608 | 572 |
| Electrophysiology | 30 | 30 | 8 | 10 | 38 | 40 |
| Total CRM | $ 434 | $ 407 | $ 212 | $ 205 | $ 646 | $ 612 |

58. The Company's Guidance for the Fourth Quarter and the Full Year 2009 in the October 19, 2009, press release was:

> The Company estimates net sales for the fourth quarter of 2009 of between $2.025 billion and $2.125 billion. Adjusted earnings – excluding acquisition-related credits, restructuring and restructuring-related costs, and amortization expense – are estimated to range between $0.17 and $0.21 per share. The Company estimates net income on a GAAP basis of between $0.20 and $0.25 per share.
>
> The Company has updated its net sales estimate for the full year of 2009 to between $8.134 billion and $8.234 billion. The Company now expects adjusted earnings for the full year – excluding intangible asset impairment charges; acquisition-, divestiture-, and litigation-related net charges; restructuring and restructuring-related costs; discrete tax items; and amortization expense – of between $0.75 and $0.79 per share. The Company expects net income on a GAAP basis of between $0.43 and $0.48 per share.

59. The October 19, 2009, press release triggered a 15% decline in the price of the

Company's stock.

60. The next day, October 20, 2009, Current Director Defendant Elliott and Individual Defendant Leno participated in a conference call with investors and analysts to discuss the previous day's press release. Individual Defendant Leno said the Company "continued to see solid growth in our CRM business in the quarter although our growth is slower than anticipated." Current Director Defendant Elliott stated BSC "delivered steady overall constant currency CRM product growth of 8% in third quarter revenues with US defib sales up 8% driven by our COGNIS intelligent products. This marks nine straight quarters of CRM growth both US and worldwide."

61. Unmentioned in both the October 19, 2009, press release and the October 20, 2009, conference call was that BSC's domestic CRM sales growth was based in large part on illegal and unethical practices by its CRM sales force. As reported in the Company's 3Q09 Form 10-Q, filed with the SEC on November 6, 2009, "[o]n September 25, 2009," nearly a month before the press release and conference call, "we received a subpoena from the U.S. Department of Health and Human Services, Office of Inspector General, requesting certain information relating to contributions made by CRM to charities with ties to physicians or their families. We are currently working with the government to understand the scope of the subpoena."

62. Instead, Individual Defendant Leno claimed during the October 20, 2009 conference call that reduced CRM sales were caused by inexperienced sales representatives:

> Now let's turn to guidance. [At the beginning of] 2009, we expected our sales and earnings in the last half of 2009 would be substantially higher than the first half. We performed well throughout the first six months of this year but *the following issues, some of which began to show up in our third quarter, will cause us to fall short of the original expectations in the last half of this year.* Beginning in the last half of 2008 and throughout 2009, *we planned to add many CRM reps, that we*

> *expected would drive significant incremental revenue in the back part of this year. We have indeed added these reps in the US, Europe, and Japan, and most have completed training, but their effectiveness in the field will take longer than we had originally envisioned.*

(Emphasis added).

63. On November 5, 2009, the Company filed a Form 8-K with the SEC announcing the retirement of William F. McConnell, Jr., Senior Vice President for Sales, Marketing and Business Strategies, CRM, effective December 31, 2009.

64. On November 6, 2009, the Company issued a press release stating that it:

> reached an agreement in principle with the U.S. Department of Justice (DOJ) related to product advisories issued by its Guidant subsidiary in 2005. The alleged conduct and product sales occurred prior to Boston Scientific's 2006 acquisition of Guidant.
>
> Boston Scientific had previously disclosed an investigation by the U.S. Attorney's Office in Minneapolis into alleged violations of the Food, Drug, and Cosmetic Act by Guidant. Under the terms of the agreement, Guidant will plead to two misdemeanor charges related to failure to include information in reports to the U.S. Food and Drug Administration (FDA), and Boston Scientific will pay $296 million on behalf of Guidant.

*See* ¶ 4, *supra*; ¶¶ 88-89, *infra*.

65. On December 10, 2009, BSC issued a press release "announced the pricing of a public offering of $2 billion aggregate principal amount of its senior notes under the Company's shelf registration statement. The public offering consists of $850 million of 4.50 percent notes due January 2015, $850 million of 6.00 percent notes due January 2020 and $300 million of 7.375 percent notes due January 2040." The press release stated the Company "plans to use the net proceeds for general corporate purposes, including prepaying a portion of its bank term loan due in April 2011. The Company expects to record a pre-tax charge, not previously anticipated, of approximately $30 million (approximately $19 million after tax, or $0.01 per share) in the fourth quarter associated with the prepayment.

66. On December 23, 2009, BSC issued a press release announcing that it had entered into a civil settlement agreement with DOJ regarding its "investigation relating to certain post-market surveys conducted by Guidant Corporation before Boston Scientific acquired Guidant in 2006." The Company agreed to pay $22 million as part of the settlement. It also agreed to enter into a corporate integrity agreement ("CIA") with the Department of Health and Human Services Office of the Inspector General ("HHS OIG"). According to the press release, "[t]he CIA requires enhancements to certain compliance procedures related to financial arrangements with health care providers. It is limited to the Company's cardiac rhythm management business, which became part of Boston Scientific through the Guidant acquisition."

67. On February 10, 2010, the Company issued a press release entitled "Boston Scientific Announces Results for Fourth Quarter and Year Ended December 31, 2009" (the "February 10, 2010, financial results press release"), which included the following assertions:

Fourth quarter highlights (sales growth rates are at constant currency):

- Recorded net sales of $2.079 billion, at the mid-point of the Company's guidance range, and achieved adjusted EPS of $0.20, at the high end of the Company's guidance range, reporting a GAAP loss of $0.71 per share
- Maintained leadership position in the worldwide drug-eluting stent (DES) market with a 39 percent share, including a 46 percent share in the U.S. and a 44 percent share in Japan
- Increased worldwide Endoscopy sales 10 percent for the quarter, and reached the $1 billion milestone in 2009 worldwide sales
- Increased worldwide Urology/Gynecology sales eight percent, including 23 percent growth in our Women's Health business
- Increased worldwide Neuromodulation sales 18 percent
- Generated 44 percent of sales from new products

- Received CE Mark approval and launched the internally developed and manufactured PROMUS® Element™ Everolimus-Eluting Coronary Stent System in Europe
- Launched the COGNIS® cardiac resynchronization therapy defibrillator (CRT-D) and TELIGEN® implantable cardiac defibrillator (ICD) systems in Japan
- Issued $2.0 billion of senior notes and prepaid remaining term loan debt maturities
- Received ratings upgrade to investment grade (BBB-) from Standard & Poor's
- Resolved longstanding litigation with settlement of $1.725 billion

Current Director Defendant Elliott said in the press release the Company "delivered a quarter in line with expectations, coming in at the middle of our sales range and the high end of our adjusted earnings range. Endoscopy, Urology/Gynecology and Neuromodulation posted excellent growth, and we maintained our clear leadership in the global drug-eluting stent market. In Japan, we have launched COGNIS, TELIGEN and our PROMUS® Everolimus-Eluting Coronary Stent System, three important new products in this key market. COGNIS and TELIGEN, the smallest and thinnest high-energy devices, are now available worldwide."

* * *

<u>Fourth Quarter 2009</u>

Net sales for the fourth quarter of 2009 were $2.079 billion, as compared to net sales of $2.002 billion for the fourth quarter of 2008. Excluding the impact of foreign currency and net sales from divested businesses, net sales were flat with the prior period.

Worldwide Cardiac Rhythm Management (CRM) group net sales for the fourth quarter – on a reported basis – were as follows:

| *(in millions)* | U.S. | | International | | Worldwide | |
|---|---|---|---|---|---|---|
| | Q4 2009 | Q4 2008 | Q4 2009 | Q4 2008 | Q4 2009 | Q4 2008 |
| ICD systems | $ 307 | $ 299 | $ 142 | $ 128 | $ 449 | $ 427 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Pacemaker systems | 82 | 84 | 76 | 60 | 158 | 144 |
| | 389 | 383 | 218 | 188 | 607 | 571 |
| Electrophysiology | 29 | 29 | 9 | 8 | 38 | 37 |
| Total CRM group | $ 418 | $ 412 | $ 227 | $ 196 | $ 645 | $ 608 |

* * *

Full Year 2009

Net sales for the full year 2009 were $8.188 billion, as compared to net sales of $8.050 billion for the full year 2008, which included sales from divested businesses of $69 million. Excluding the impact of foreign currency and net sales from divested businesses, net sales increased four percent over the prior period.

Worldwide CRM group sales for the full year – on a reported basis – were as follows:

| *(in millions)* | U.S. | | International | | Worldwide | |
|---|---|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 | 2009 | 2008 |
| ICD systems | $1,248 | $1,140 | $544 | $541 | $1,792 | $1,681 |
| Pacemaker systems | 346 | 340 | 275 | 265 | 621 | 605 |
| | 1,594 | 1,480 | 819 | 806 | 2,413 | 2,286 |
| Electrophysiology | 116 | 116 | 33 | 37 | 149 | 153 |
| Total CRM group | $1,710 | $1,596 | $852 | $843 | $2,562 | $2,439 |

68. The Company's guidance for the first quarter of 2010 was an estimate of net sales "of between $2.000 billion and $2.100 billion. Adjusted earnings, excluding acquisition-related credits, restructuring and restructuring-related costs, and amortization expense, are estimated to range between $0.13 and $0.17 per share. The Company estimates net income on a GAAP basis of between $0.15 and $0.20 per share." For the full year 2010, it estimated net sales "of between $8.100 billion and $8.500 billion. Adjusted earnings, excluding acquisition-related credits, restructuring and restructuring-related costs, and amortization expense, are estimated to range between $0.62 and $0.72 per share. The Company estimates net income on a GAAP basis of between $0.37 and $0.49 per share."

69. Unmentioned in the February 10, 2010, financial results press release was the fact

that U.S. CRM group sales declined by $34 million in the fourth quarter of 2009, from $434 million to $418 million, and that worldwide sales had declined by $1 million. In contrast, the pronouncements by Current Director Defendant Elliott and his predecessor Individual Defendant Tobin in the prior three results press releases during the Relevant Period (April 20, July 20, and October 19, 2009) had trumpeted continuing CRM product sales growth.

70. The financial results press release caused another 10% drop in the price of the Company's shares.

71. Also on February 10, 2010, BSC issued a press release "announc[ing] a series of management changes and restructuring initiatives designed to strengthen the Company and position it for long-term success" (the "February 10, 2010, reorganization press release"). Current Director Defendant Elliott said in the press release that "[t]he actions we are announcing today will provide the organizational structure and leadership needed to execute our strategic plan and fulfill the enormous promise of this company. They are aimed at driving innovation, accelerating profitable growth and increasing both accountability and shareholder value. Above all else, they will help us better serve our customers and their patients." Among the changes announced were:

> The Cardiovascular Group and Cardiac Rhythm Management Group (formerly Guidant) will be combined into one, stronger and more competitive organization that will deliver better value to hospitals, better solutions to physicians and better outcomes to patients. This combined organization will also position the Company to respond more efficiently and effectively to rapidly accelerating changes in the procurement, reimbursement and regulatory environments, and to other changes in the delivery of health care globally. The new organization will be led by Hank Kucheman, who has been promoted to Executive Vice President and President of the new Cardiology, Rhythm and Vascular Group. Mr. Kucheman most recently served as President of the Cardiovascular Group. The Group will increase its focus on structural heart, disruptive, primary prevention ICDs, atrial fibrillation and hypertension. The Endovascular Unit, including Peripheral Solutions, Neurovascular, Imaging, Electrophysiology and the Canadian business unit, will

> report to new Senior Vice President and Executive Committee member, Joe Fitzgerald.
>
> Fred Colen has been promoted to the new role of Executive Vice President and Chief Technology Officer (CTO). As CTO, Mr. Colen will oversee a centralized corporate research and development group that will refocus and strengthen the Company's innovation efforts. Under Mr. Colen's leadership, the Company will change its allocation of R&D resources to incorporate its newly established growth priorities, create technology Centers of Excellence, drive improved product development timing and efficiency, and expand the spectrum of new product opportunities. *Mr. Colen most recently served as President of the Cardiac Rhythm Management Group.*
>
> * * *
>
> Sam Leno will be promoted to Executive Vice President and Chief Operations Officer, effective March 1. He will oversee Finance, Information Systems, Manufacturing and Operations. Since joining Boston Scientific in 2007, Mr. Leno has served as Executive Vice President of Finance and Information Systems and Chief Financial Officer.
>
> * * *
>
> Larry Neumann has been promoted to Senior Vice President of Restructuring and Integration. Mr. Neumann will oversee and be accountable for all the Company's restructuring and integration activities, including the combination of the Cardiovascular Group and the Cardiac Rhythm Management Group. Mr. Neumann joined the Company in 1996 and has served in a number of capacities, including head of Corporate Tax, Business Development and Investor Relations.

(Emphasis added).

72. The next day, February 11, 2010, Current Director Defendant Elliott, Individual Defendant Leno, and Chief Accounting Officer Jeff Capello ("Capello"), among others, participated in a conference call with investors and analysts to discuss the previous day's press releases. Elliott provided additional insight as to both the Company's poor earnings report and its management shakeup:

> Dislikes, now let's look at what we didn't like. Number one, *we didn't like how we got to our fourth quarter earnings. To quote the old street phrase, "we got there ugly" but better on the number than under it. We didn't like our gross margins, which fell for the second straight quarter although a large majority of*

> *the drop is due to two non-recurring events, the CRM advisory and third-party sourcing agreement.*
>
> * * *
>
> Number three, we didn't like the response of St. Jude Medical to the disciplinary actions we took during December. *We exited from our company several sales representatives and managers who among other things repeatedly breached our healthcare professional Code of Conduct. St. Jude has chosen to quickly hire many of our departed staff*, we have invested extensively in building our HCP program under our new Chief Compliance Officer, Jean Lance. We have strengthened our internal policy and act[ed] aggressively to [e]nsure ourselves [that] all of our customers facing employees comply with those policies. We hope and expect our policies and overall approach [are] leading edge and executable globally. We cannot control what others do.
>
> *So-called greener pastures may allow for a more relaxed viewpoint towards HCP relationships. The problem with pastures are, you have to be careful where you step. By taking these chances, market share gains maybe created but these gains can be expensive and might go far into the future. In the short haul, we will for certain lose sales*, but I believe in the long haul we will be held in high regard by those that count for our efforts in the healthcare professionals arena. Others may not be so fortunate.

(Emphasis added).

73. Capello added that:

> Disciplinary measures that we took with a number [of] our U.S. CRM sales team members at the end of 2009 will have a negative effect on our U.S. CRM sales performance during 2010, despite having what we believe to be the best technology on the market. *These actions were necessary to insure that we realized our longer term sales potential of the CRM business.* In addition, we have begun to launch a newly approved version of cognizant intelligent with a strengthen header. However, we lost some opportunity in the fourth quarter as a result of the subpectoral product advisory we issued[1] and we could face some additional lost sales as we work to restore physician confidence. ***As a result, the CRM disciplinary and advisory measures could result in as much as $100 million less in sales in 2010, resulting in lower year-over-year growth rates.***

(Emphasis added).

[1] On December 1, 2009, the Company issued a "Dear Doctor" letter warning physicians about a weakened header-bond issue with its COGNIS CRT-D and TELIGEN ICD devices and advising them not to implant them under the pectoral muscle of cardiac patients. *See* ¶ 80, *infra.*

74. Elliott and Capello thus admitted "several" CRM "sales representatives and managers" had, "among other things repeatedly breached" the Company's Professional Code of Conduct, and that its sales of CRM products "could" suffer significantly as a result of their termination. According to its web site, the Company subscribes to the Advanced Medical Technology Association ("AdvaMed") Code of Ethics on Interactions with Health Care Professionals. The AdvaMed Code of Ethics prohibit, for example, the provision of charitable donations to Health Care Professionals "as an unlawful inducement" Monetary oo in kind donations may be made:

> for charitable purposes, such as supporting indigent care, patient education, public education, or the sponsorship of events where the proceeds are intended for charitable purposes. Donations should be motivated by *bona fide* charitable purposes and should be made only to *bona fide* charitable organizations or, in rare instances, to individuals engaged in genuine charitable activities for the support of a *bona fide* charitable mission. Companies should exercise diligence to ensure the *bona fide* nature of the charitable organization or charitable mission.

AdvaMed Code of Ethics § XI.c. In addition, the Company's Code of Conduct states that:

> We do not sacrifice integrity to make or maintain sales. Our marketing and sales activities should not encourage customers or their representatives to place their personal interests above those of their employers or patients. All gifts, payments, and business courtesies, including meals, must:
>
> • Comply with legal requirements, generally accepted ethics, and the standards of the recipient's organization.
>
> • Comply with all company policies that apply to your location.
>
> • Be consistent with Boston Scientific's commitment to integrity.

75. The Company's Form 10-K, filed with the SEC on February 26, 2010 ("2010 10-K"), and signed by all of the Current Director Defendants, stated in the "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS" section that:

> Net sales from our CRM group represent a significant source of our overall net sales. Therefore, increases or decreases in our CRM group net sales could have a significant impact on our results of operations. Recent disciplinary actions we have taken against certain of our U.S. CRM sales personnel ***could*** result in lost U.S. CRM net sales in the short term. We believe that with sustained targeted investments we can continue to grow our worldwide CRM business. However, the following variables may impact the size of the CRM market and/or our share of that market:
>
> * * *
>
> - the ability of CRM manufacturers to maintain the trust and confidence of the implanting physician community, the referring physician community and prospective patients in CRM technologies[; and]
>
> * * *
>
> - our ability to retain key members of our sales team and other key personnel, particularly following disciplinary actions taken during the year[.]

(Emphasis added).

76. The statement in the February 26, 2010, 10-K that the Company "could" lose CRM sales as a result of the disciplinary actions was contradictory to Current Directory Defendant Elliott's comment on the February 11, 2010, conference call that "we will for certain lose sales."

77. On February 10, 2010, BSC issued a press release joining a controversy regarding possible defects in its COGNIS CRT-D system (the "February 10, 2010 HeartRhythm press release"). The release, entitled "Boston Scientific Rebuts HeartRhythm Article," addressed concerns that the COGNIS CRT-D system had delivering unnecessary shocks to a patient who had the device implanted subpectorally. These shocks led to multiple episodes of inappropriate anti-tachycardia pacing ("ATP").[2] The HeartRhythm article claimed that a weakened header

[2] "ATP" refers to "a series of small electrical impulses . . . delivered to the heart muscle to

bond in BSC's product caused the problem. The press release stated:

> We find it unacceptable that HeartRhythm rushed this manuscript to publication and speculated on the cause of the problem without requesting from us a detailed engineering analysis of the explanted device. Our analysis found that while the bond between the header and the case was weakened, the device functioned normally and a weakened header bond was not the cause of the abnormal sensing and pacing impedance observed in this patient.
>
> X-ray analysis and electrical testing verified that the header wires were neither fractured nor otherwise damaged, and the seal between the header and the case was secure with no evidence of body fluid under the header. In short, there is no mechanism to link the noise observations to a weakened header bond.
>
> Noise observations during the initial implant were not header-related. In fact, the authors themselves stated: "It is possible that the initial noise observed on the RV pace/sense channel was due to an RV lead abnormality and not to the header abnormality." None of the leads implanted in the patient were manufactured by Boston Scientific.
>
> Including this most recent case, only three instances of weakened header bonds have been observed in a context of more than 90,000 COGNIS and TELIGEN devices implanted subcutaneously. The overall rate of events for this device family compares very favorably to the performance of similar devices and is well within accepted performance ranges.

78. Current Director Defendant Elliott discussed the issue during the February 11, 2010, conference call, stating:

> Heart Rhythm was completely out of line to publish this article prematurely, without even requesting our engineering analysis of the explanted device. We conducted our own analysis that became abundantly clear that our device worked normally and that the weakened header bond was not the problem. We believe the problem was caused by a competitors' lead, not our device. Even if you count this case, we've seen only three cases of potential problems with header bond in subcutaneous implant out of more than 90,000 cases. Those numbers are well within accepted norms. *We've improved the bond and we're getting these devices out to customers, allowing for either subpectoral or subcutaneous implantation. This transition should be completed next month.*

---

restore a normal heart rate and rhythm" when "the heart beats too fast." www.webmd.com/heart-disease/guide/heart-disease-abnormal-heart-rhythm?page=2.

(Emphasis added). Thus, Elliott simultaneously denied there was a problem and said it was being corrected.

79. In the February 10, 2010 HeartRhythm press release, the Company indicated it had received regulatory approval for and implemented a manufacturing process change to correct the header problem, rendering the Company's and Elliott's outrage highly questionable. It stated:

> We have implemented manufacturing process improvements to strengthen the header bond on these devices, allowing physicians to implant devices in either a subpectoral or subcutaneous position. We have received approval from U.S. and European regulatory authorities for the devices with the strengthened header bond and have been shipping these devices. **We expect to complete the transition to these devices by next month.**

80. On February 12, 2010, the authors of the *HeartRhythm* article responded to the Company's rebuttal of their report, stating in an article published on heart*wire* (www.theheart.org):

> [Beth Israel Deaconess Medical Center Dr. William H.] Maisel and [Winthrop-University Hospital Dr. Joseph J.] Germano said they did indeed receive a copy of the company's analysis before submitting the case report to the journal. In fact, some of the report details were included in their paper, they say.
>
> "Quite frankly I'm a little bit at a loss to explain Boston Scientific's reaction," Maisel told heart*wire*. "We're a little bit confused by their statement that the journal published it before we'd received the manufacturing analysis, because *we had a letter from them with the analysis, dated prior to the acceptance date of the manuscript*."

(Emphasis added). The article reported that Maisel and Germano believed the Company knew about the header problems for some time:

> As Germano explained to heart*wire*, when device interrogation detected the inappropriate therapies, he and his colleagues first suspected the lead, which they replaced. *But when the events continued, they opted to replace the generator itself. That's when they noticed that the header – the structure that connects the leads to the main device – was partially detached from the device itself. "It was impressive," Germano said. "This wasn't a subtle finding*."

> Header problem already acknowledged
>
> *Boston Scientific, in fact, was already aware of what it described as a rare, weakened header-bond problem with two brands of devices – the COGNIS CRT-D and the TELIGEN ICD. The company had sent a "Dear Doctor" letter in December 2009, warning physicians that mechanical stress associated with subpectoral implantation may weaken the bond between the header and the titanium case of the device itself*. In this December announcement, Boston Scientific said it was aware of two subpectoral cases, worldwide, of weakened header bonds. The December alert also estimated that just 5% of the 77,000 Cognis and Teligen devices implanted worldwide would have been implanted in the subpectoral location.

(Emphasis added). *See* ¶ 73 n.1, *supra*.

81. The final blow to the Company during the Relevant Period was delivered on March 15, 2010, when it announced in a press release before the market opened that "it has stopped shipment and is retrieving field inventory of all its implantable cardioverter defibrillators (ICDs) and cardiac resynchronization therapy defibrillators (CRT-Ds)." The reason given for this catastrophic development was that BSC "determined that some manufacturing process changes were not submitted for approval to the [FDA]. At this time, the company has identified two instances of changes that, while successfully validated, were not submitted to the FDA. . . . Product families included in this advisory include: COGNIS®, CONFIENT™, LIVIAN™, PRIZM™, RENEWAL®, TELIGEN® and VITALITY™. The Company's pacemakers and other products are not affected by this advisory." The press release noted that "[g]iven the financial uncertainty involved, these actions could have a material impact on the Company's previously issued guidance, including revenue, operating profit and cash flows for the first quarter and full year of 2010."

82. BSC's shares dropped another 12.6% on this news.

83. An article published in the *Wall Street Journal* on March 30, 2010, cited a memorandum sent by Company General Counsel Timothy Pratt to certain employees as stating

that DOJ and the SEC were "requesting information" regarding the recall. Specifically, DOJ had sent the Company a subpoena, and the SEC had begun an informal inquiry. According to the article, the memorandum stated that "investigators are seeking company documents regarding the company's discovery that it hadn't gotten FDA approval, as well as communications with regulators, physicians and stock analysts about the withdrawal." In addition, they were looking for "any reports of injuries."

84. On April 15, the Company announced it received clearance from the FDA to resume distributing its COGNIS CRT-Ds and TELIGEN ICDs.

**<u>Guidant's Other Compliance Issues</u>**

85. On June 26, 2006, BSC announced that it was "retrieving a specific subset of pacemakers, cardiac resynchronization pacemakers and implantable cardioverter defibrillators from its sales force and hospital inventories" manufactured by its CRM Group, formerly Guidant's CRM business. The recalled "devices includes INSIGNIA and NEXUS pacemakers, CONTAK RENEWAL TR/TR2 cardiac resynchronization pacemakers, and VENTAK PRIZM 2, VITALITY, and VITALITY 2 implantable cardioverter defibrillators." The problem with the devices was identified as "a supplier's low-voltage capacitor that is not performing to the company's expectations," with the result that "[p]atients with affected pacemakers may experience intermittent or permanent loss of output or telemetry, or premature battery depletion," and "[p]atients with affected defibrillators may experience inappropriate sensing or premature battery depletion."

86. The Company's Form 10-Q for 2Q06 also disclosed that:

> On December 23, 2005, Guidant received an FDA warning letter citing certain deficiencies with respect to Guidant's manufacturing quality systems and record keeping procedures in its CRM facility in St. Paul, Minnesota. This FDA warning letter resulted from an extensive inspection by the FDA of these CRM facilities

that was completed on September 1, 2005 and cited a number of inspectional observations. Guidant received a follow-up letter from the FDA dated January 5, 2006. As stated in this FDA warning letter, until the identified deficiencies have been corrected, the FDA may not grant requests by Guidant for exportation certificates to foreign governments or approve pre-market approval applications for Guidant's class III devices to which the deficiencies described are reasonably related. A further FDA inspection of Guidant's CRM facility was conducted between December 15, 2005 and February 9, 2006 and resulted in one additional inspectional observation.

87. Guidant had experienced a host of other problems shortly before its acquisition by BSC. Its Form 10-Q for 3Q05 reported that:

> During the second quarter of 2005, [Guidant] recorded a $113.1 million charge to cost of products sold, including a $94.0 million warranty charge to cover the current and anticipated future costs associated with supplemental warranty programs resulting from a series of field actions for certain implantable defibrillators and pacemakers and $19.1 million for estimated write downs of non-saleable inventory. The $94.0 million charge was based primarily upon [Guidant]'s estimates of the number of devices which physicians may choose to replace under the programs. These estimates were determined through a device-specific review of relevant current and historical product recall observations, including US Food and Drug Administration (FDA) recall classification, known and expected device failure rates, the presence of non-invasive corrective actions and the remaining service life of the device. The supplemental warranty programs are available through December 31, 2005 and cover the product and certain costs should a physician determine replacement of a patient's device is appropriate, as well as the return of any unused inventory. Based on the most recent information available (inclusive of Guidant's actual experience, industry data and market research), [Guidant] currently estimates the ultimate number of warranty claims that will be made under the supplemental warranty program will be lower than originally estimated. As a result of this change in estimate, [Guidant] lowered its accrual associated with supplemental warranty programs by approximately $28.0 million during the third quarter of 2005.
>
> During the third quarter of 2005, Guidant recorded an $11.0 million charge to cost of products sold, including a $9.5 million warranty charge to cover the current and anticipated future costs associated with the OMNILINK® .035 and .018 Biliary Stent System field action taken in the third quarter of 2005. . . . The charge primarily relates to the sales value of customer inventory recalled under this field action.

88. Guidant's Form 10-K for 2005 ("2005 10-K"), filed with the SEC on February 22, 2006, reported that:

> In October 2005, the Company received administrative subpoenas from the US Department of Justice US Attorney's offices in Boston and Minneapolis, issued under the Health Insurance Portability & Accountability Act of 1996. The subpoena from the US Attorney's office in Boston requests documents concerning marketing practices for pacemakers, implantable cardioverter defibrillators, leads and related products. The subpoena from the US Attorney's office in Minneapolis requests documents relating to the Company's VENTAK PRIZM 2 and CONTAK RENEWAL and CONTAK RENEWAL 2 devices. The Company is cooperating in these matters.

The Minnesota investigation resulted in a plea agreement between Guidant and the DOJ on February 24, 2010, in which Guidant agreed to plead guilty to one misdemeanor count of making materially false and misleading statements in violation of the FDCA, 21 U.S.C. §§ 331(q)(2), 333(a)(1), and one misdemeanor count of promptly failing to notify the FDA of a correction it made to a medical device to reduce a risk to health posed by the device in violation of the FDCA, 21 U.S.C. §§ 331(q)(1), 360i(g), and 333(a)(1). Guidant agreed to pay a criminal fine of $253,962,251 and a criminal forfeiture of $42,079,675.

89. The plea agreement subsequently was rejected by the court on the basis that it did not contain a term of probation or require community service, the government had not established clear guidelines that directed individuals as to how they can petition for remission of forfeited funds, and the government had not stated how unclaimed forfeited funds would be distributed. *United States v. Guidant LLC*. The court stated that:

> The alleged victims characterized Guidant as a repeat offender by pointing to (1) a 2003 guilty plea by a Guidant subsidiary, Endovascular Technologies, Inc., (2) a $22 million civil settlement in December 2009 between Boston Scientific and the U.S. Department of Justice related to post-market surveys and payments made to doctors by Guidant Corporation before it was acquired by Boston Scientific; and (3) Boston Scientific's March 15, 2010 announcement that it had stopped shipment and was retrieving field inventory of all its ICDs and CRT-Ds. As part of both the Endovascular Technologies, Inc.'s guilty plea and the $ 22 million civil settlement, corporate integrity agreements were entered into with the OIG to promote, among other things, compliance with federal regulations. The alleged victims contend that Guidant, as a company, does not respect the criminal justice

> system and should be required to do more than simply pay fines as a consequence for its criminal behavior.

2010 U.S. Dist. LEXIS 40994, at *35-*36 (footnotes omitted). The court added that it "disagree[d] with the Government's position that Guidant's current corporate structure renders any probation meaningless, especially given the fact that Boston Scientific itself recently entered into a $22 million settlement and corporate integrity agreement based on certain pre-acquisition actions by Guidant," and found that "[a]t a minimum, the public's interest in accountability would be served by Guidant *and Boston Scientific* being placed on probation, regardless of the fact that Boston Scientific acquired Guidant after the events in question." *Id.*, at *38 (emphasis added).

90. Guidant's 2005 10-K stated that in October 2005, the company received a "subpoena from the US Attorney's office in Boston requests documents concerning marketing practices for pacemakers, implantable cardioverter defibrillators, leads and related products." The investigation led to the civil settlement, including the $22 million payment and CIA, announced by the Company in the December 23, 2009, press release.

91. The CIA, executed with HHS OIG, is effective for five years, and is far broader in scope than stated in the December 23, 2009, press release. It calls for the creation and implementation of stringent procedures to ensure that contractual and non-contractual arrangements do not violate the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and mandates formal written standards and training. Significantly, the CIA requires BSC's Chief Compliance Officer to report regarding compliance matters at least quarterly to the Board or a designated committee "and shall be authorized to report on such matters to the Board of Directors (or designated committee) at any time." Furthermore, the CIA requires the Board's Audit or CQ Committee to "be responsible for the review and oversight of matters related to compliance with

Federal health care program requirements and the obligations of th[e] CIA," which entails, "at a minimum:"

> a. meeting in person or via tele- or video-conference at least quarterly to review and oversee Boston Scientific's Compliance Program, as applied to Guidant/CRM, including but not limited to the performance of the Chief Compliance Officer and other Global Compliance Program personnel.
>
> b. for each Reporting Period of the CIA, adopting a resolution summarizing its review and oversight of Boston Scientific's compliance with Federal health care program requirements and the obligations of this CIA by Boston Scientific and/or Guidant/CRM, as applicable. Each individual member of the Board Committee shall sign a statement indicating that he or she agrees with the resolution.

At minimum, the resolution shall include the following language:

> "The [Name of the Board Committee] has made a reasonable inquiry into the operations of Boston Scientific's Compliance Program as applied to Guidant/CRM, including the performance of the Chief Compliance Officer and the Global Compliance Program personnel. Based on its inquiry, [Name of the Board Committee] has concluded that, to the best of its knowledge, Boston Scientific has implemented an effective Global Compliance Program, as applied to Guidant/CRM, to meet the Federal health care program requirements and the obligations of the CIA."

If the Board Committee is unable to provide such a conclusion in the resolution, the Board Committee shall include in the resolution a written explanation of the reasons why it is unable to provide the conclusion and the steps it is taking to implement an effective Global Compliance Program at Boston Scientific, as applied to Guidant/CRM.

92. In the 2010 10-K, BSC stated that:

The obligations imposed upon us by the CIA and cooperation with ongoing investigations will involve human resources costs and diversion of management and employee focus. Cooperation typically also involves document production costs. We cannot predict when the investigations will be resolved, the outcome of these investigations or their impact on us. An adverse outcome in one or more of these investigations could include the commencement of civil and criminal proceedings; substantial fines, penalties and administrative remedies, including exclusion from government reimbursement programs and entry into additional CIAs or an amendment to the existing CIA. In addition, resolution of any of these matters could involve the imposition of additional and costly compliance

> obligations, including entering into additional CIAs. We may incur greater future costs to fulfill the obligations imposed upon us by the CIA. Furthermore, the CIA, and if any of the ongoing investigations continue over a long period of time, could further divert the attention of management from the day-to-day operations of our business and impose significant additional administrative burdens on us. These potential consequences, as well as any adverse outcome from these investigations, could have a material adverse effect on our financial condition, results of operations and liquidity.

**The Securities Fraud Action**

93. The Securities Fraud Action was filed on April 9, 2010. It is based on the same core facts as the present action. The complaint in the Securities Fraud Action alleges that BSC, Current Director Defendant Elliott, and Individual Defendants Tobin and Leno violated section 10(b) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder in that they "disseminated or approved the false statements" during the Relevant Period "which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

94. The complaint in the Securities Fraud Action also alleges that the defendants in the matter violated section 20(a) of the 1934 Act because Elliott, Tobin, and Leno "acting as controlling persons" of BSC, "[b]y reason of their positions as officers and/or directors of [the Company] and their ownership of [BSC] stock, the [Elliott, Tobin, and Leno] had the power and authority to cause [the Company] to engage in the wrongful conduct complained of," and the Company "controlled [Elliott, Tobin, and Leno] and all of its employees."

95. The plaintiff in the Securities Fraud Action seeks, among other things, monetary damages on behalf of itself and the purported class based on the sharp drop in the Company's stock price during the Relevant Period resulting from the defendants' fraudulent actions.

## DEMAND IS FUTILE

96. Plaintiff brings this action derivatively in the right and for the benefit of BSC to redress injuries suffered and to be suffered by BSC because of breaches of fiduciary duty by the Individual Defendants.

97. Plaintiff will adequately and fairly represent the interests of BSC and its shareholders in enforcing and prosecuting its rights. This action is not a collusive one designed to confer jurisdiction on this Court that it would otherwise not have.

98. Plaintiff is the owner of BSC common stock and was the owner of such shares at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

99. Plaintiff has not made a demand on the Board of Directors to bring this cause of action because such a demand would be futile. Currently, BSC's Board consists of twelve members: Abele, Bartlett, Byrnes, Connors, Elliott, Fox, Groves, Mario, N.J. Nicholas, P.M. Nicholas, Reinhardt, and Sununu. As discussed in detail below, a majority of the current directors, *i.e.*, at least seven of the twelve Board members at the time this complaint was filed, have specific personal conflicts of interest or have demonstrated their individual inability to act independently and impartially.

**Current Director Defendant Elliott**

100. The present action and the Securities Fraud Action share many common facts and allegations. The complaint in the Securities Fraud Action contains actionable, detailed allegations of scienter, including allegations of actual knowledge of disloyal misconduct by Elliott. There is no reasonable possibility he can be expected to exercise independent business judgment as to whether to pursue claims against himself in this matter, as such a decision will increase his risk of liability in the Securities Fraud Action.

**<u>The Audit Committee—Current Director Defendants Byrnes, Mario, and Reinhardt</u>**

101. Current Director Defendants Byrnes, Mario, and Reinhardt were members of the Audit Committee during the Relevant Period. As such, they were responsible for "assisting the Board's oversight of the quality and integrity of the Company's financial reporting process, financial statements and related disclosure." The Audit Committee members were required to, among other things, "**review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor,** ***including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations,"*** **before the filing of the Company's reports on Form 10-K and Form 10-Q;"** and **"discuss generally the type of information to be disclosed, and the type of presentation to be made,** ***in earnings press releases . . . as well as the type of information to be disclosed, and the type of presentation to be made, in any financial information and earnings guidance provided to analysts and rating agencies."*** (Emphasis added).

102. Current Director Defendants Byrnes, Mario, and Reinhardt utterly failed to perform their duties, which they were required to exercise with loyalty and in good faith, in that they had access to adverse non-public information about the financial condition and operations of BSC, and drafted, produced, reviewed, and/or disseminated the material false and misleading statements and information and/or were aware, or should have been aware, or recklessly disregarded, that material false and misleading statements were being issued regarding the Company, or omitted to disclose facts they knew or disregarded that were necessary to make the statements made not misleading to investors, such material false and misleading statements including those made in the April 20, 2009, press release; the April 21, 2009, conference call; the

May 19, 2009, press release; the July 20, 2009, press release; the July 21, 2009, conference call; the October 19, 2009, press release; the October 20, 2009, conference call; the December 23, 2009, press release; the February 10, 2010, financial results press release; the February 10, 2010, reorganization press release; the February 10, 2010 HeartRhythm press release; the February 11, 2010, conference call; the 2010 10-K; and the March 15, 2010, press release. These statements were materially false and misleading because:

- The statements about CRM sales, demand, market share and growth, and the strength and success of BSC's CRM sales force failed to disclose the extent to which sales and demand had been artificially inflated by the payment of illegal and improper inducements to health care professionals;

- The statements about CRM sales and demand failed to disclose the extent to which the reported or anticipated revenues resulted from the sale of products which had been manufactured without required FDA approval, such that they were subject to recall and refund or replacement;

- The financial guidance provided in BSC's earnings releases and on investor conference calls did not disclose the extent to which the sales estimates had been inflated by sales expected to be achieved through the payment of illegal and improper inducements;

- The statements about weaker than expected growth in the CRM market in 3Q09 failed to disclose the extent to which demand had weakened due to the curtailment and cessation of payments of illegal and improper inducements to health care professionals and by attributing weakened demand to other factors;

- The statements about CRM sales in general and sales of COGNIS and TELIGEN ICDs in particular failed to timely or fully disclose the problems and defects in the headers of the devices;

- The statements about CRM sales in general and sales of ICDs and CRT-Ds in particular did not disclose the unapproved manufacturing process changes for these products that led to the March 15, 2010, recall;

- The statements about how the termination of CRM sales staff for disciplinary reasons "could' result in significantly lower CRM sales in the United States in 2010 failed to fully disclose the effect the termination was expected to have; and

- The December 23, 2009, press release regarding the CIA implied that the agreement was related entirely to the pre-acquisition investigation of and misconduct by Guidant, and failed to disclose that the agreement resulted from or was otherwise related to an

investigation into similar post-acquisition and ongoing business activities that threatened BSC's current and future revenues and business reputation.

103. If Current Director Defendants Byrnes, Mario, and Reinhardt did not have access to adverse non-public information about the financial condition and operations of BSC as members of the Audit Committee, then they utterly failed to implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors and employees of BSC from disseminating materially false and misleading statements and information.

104. In addition, as members of the Audit Committee, Current Director Defendants Byrnes, Mario, and Reinhardt were responsible for "assisting the Board's oversight of . . . the Company's compliance with legal and regulatory requirements, [and] the Company's ethics and integrity programs." They were obligated to "monitor adherence to established corporate policies, codes and practices, including such matters as conflicts of interest, questionable payments and standards of business conduct, and . . . arrange for any special investigations or audits that may be deemed necessary" and "monitor compliance with the Company's Code of Conduct, including reviewing with the general counsel the adequacy and effectiveness of the Company's procedures to ensure proper compliance." They utterly failed to perform their duties to prevent the Company's officers, directors, and employees from violating or acting in contravention to applicable legal and internal requirements, which they were required to exercise with loyalty and in good faith, in that they had access to adverse non-public information that the Company's CRM sales force and managers were artificially inflating sales of its CRM products through illegal inducements that also violated company policy, yet failed to take timely action to stop these and other improper practices.

105. If Current Director Defendants Byrnes, Mario, and Reinhardt did not have access

to adverse non-public information as members of the Audit Committee that the Company's CRM sales force and managers were artificially inflating sales of its CRM products through illegal inducements that also violated company policy, then they utterly failed to implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors and employees of BSC from violating or acting in contravention to, applicable legal requirements and Company policy.

106. The utter failure of the members of the Audit Committee to exercise their fiduciary duties in good faith is especially egregious in light of the numerous "red flag" warnings that were known to them about Guidant and the Company's CRM products, both before and after Guidant was acquired by BSC. Those red flags included:

- The December 23, 2005, warning letter Guidant received from the FDA citing certain deficiencies with respect to its manufacturing quality systems and record keeping procedures in its CRM facility in St. Paul, Minnesota;

- The 2005 $113.1 million charge to cost of products sold, including a $94.0 million warranty charge to cover the current and anticipated future costs associated with supplemental warranty programs resulting from a series of field actions for certain implantable defibrillators and pacemakers and $19.1 million for estimated write downs of non-saleable inventory;

- The 2005 administrative subpoena Guidant received from the U.S. Attorney's office in Minneapolis requesting documents relating to the Company's VENTAK PRIZM 2 and CONTAK RENEWAL and CONTAK RENEWAL 2 devices that resulted in a plea agreement between Guidant and DOJ on February 24, 2010, in which Guidant agreed to plead guilty to two misdemeanor counts and pay a criminal fine of $253,962,251 and a criminal forfeiture of $42,079,675, a plea agreement that the court rejected because, among other things, *it did not place BSC on probation*;

- The 2005 administrative subpoena Guidant received from the U.S. Attorney's office in Boston requesting documents concerning its marketing practices for pacemakers, ICDs, leads and related products that resulted in the $22 million settlement and the CIA;

- The *qui tam* action alleging violations of the FCA, *United States ex rel. Bennett v. Boston Scientific Corp.,* and the related derivative action, *Lin v. Tobin,* both of which involve the Company's improper marketing of its microwave surgical ablation system, a CRM product, for the off-label use of treating atrial fibrillation.

107. The absolute failure of the members of the Audit Committee to perform their duties in good faith raises a substantial likelihood of non-exculpated personal liability on their part. As a result, they cannot impartially consider a demand on the Board to commence litigation against themselves.

**The CQ Committee - Current Director Defendants Connors, Fox, Mario, Reinhardt, and Sununu**

108. Current Director Defendants Connors, Fox, Mario, Reinhardt, and Sununu were members of the CQ Committee during the Relevant Period. As such, they were responsible for overseeing and evaluating: "(i) the Company's compliance and quality control systems and initiatives; (ii) the systems in place to maintain, and identify deviations from, the Company's compliance and quality control standards; and (iii) the Company's efforts to meet or exceed its compliance and quality control standards."

109. Current Director Defendants Connors, Fox, Mario, Reinhardt, and Sununu utterly failed to perform their duties, which they were required to exercise with loyalty and in good faith, in that, as members of the CQ Committee, they had access to adverse non-public information about BSC's compliance and quality control systems, standards, and initiatives, and drafted, produced, reviewed, and/or disseminated the material false and misleading statements and information and/or were aware, or should have been aware, or recklessly disregarded, that material false and misleading statements were being issued regarding the Company, or omitted to disclose facts they knew or disregarded that were necessary to make the statements made not misleading to investors, such material false and misleading statements including those made in the April 20, 2009, press release; the April 21, 2009, conference call; the May 19, 2009, press release; the July 20, 2009, press release; the July 21, 2009, conference call; the October 19, 2009,

press release; the October 20, 2009, conference call; the December 23, 2009, press release; the February 10, 2010, financial results press release; the February 10, 2010, reorganization press release; the February 10, 2010 HeartRhythm press release; the February 11, 2010, conference call; the 2010 10-K; and the March 15, 2010, press release. These statements were materially false and misleading because, among other things:

- The statements about CRM sales in general and sales of COGNIS and TELIGEN ICDs in particular failed to timely or fully disclose the problems and defects in the headers of the devices; and

- The statements about CRM sales in general and sales of ICDs and CRT-Ds in particular did not disclose the unapproved manufacturing process changes for these products that led to the March 15, 2010, recall.

110. If Current Director Defendants Connors, Fox, Mario, Reinhardt, and Sununu did not have access to adverse non-public information about the compliance and quality control systems, standards, and initiatives of BSC as members of the QC Committee, then they utterly failed to implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors and employees of BSC from disseminating materially false and misleading statements and information.

111. In addition, as members of the CQ Committee, Current Director Defendants Connors, Fox, Mario, Reinhardt, and Sununu were required to, among other things, "monitor and evaluate the Company's compliance and quality control systems and initiatives;" "review and discuss with senior management the adequacy and effectiveness of the Company's compliance and quality control systems and initiatives, and consider recommendations for improvement thereof;" "receive reports from senior management summarizing material: (a) deviations from the Company's compliance and quality control standards; (b) product inquiry reports; (c) field action decisions; (d) corrective and preventative actions; (e) results of FDA inspections or

notified body audits; (f) late complaint reporting; (g) product recalls; and (h) other matters deemed relevant by the Committee;" and "receive reports from senior management summarizing quality compliance-related activities undertaken by the Company and the results of quality compliance audits conducted." They utterly failed to perform their duties with respect to the Company's compliance and quality control systems and initiatives in that they had access to adverse non-public information that the COGNIS and TELIGEN ICDs problems and defects in the headers of the devices, and that ICDs and CRT-Ds were made using unapproved manufacturing process changes, yet failed to take timely action to stop these and other improper practices.

112. If Current Director Defendants Connors, Fox, Mario, Reinhardt, and Sununu did not have access to adverse non-public information as members of the CQ Committee that the COGNIS and TELIGEN ICDs problems and defects in the headers of the devices, and that ICDs and CRT-Ds were made using unapproved manufacturing process changes, then they utterly failed to implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent such situations from arising.

113. For the reasons discussed above, the utter failure of the members of the CQ Committee to exercise their fiduciary duties in good faith is especially egregious in light of the numerous "red flag" warnings that were known to them about Guidant and the Company's CRM products, both before and after it was acquired by BSC.

114. The absolute failure of the members of the CQ Committee to perform their duties in good faith raises a substantial likelihood of non-exculpated personal liability on their part. As a result, they cannot impartially consider a demand on the Board to commence litigation against themselves.

**A Majority of the Board Cannot Consider A Demand Impartially**

115. For the reasons discussed above, Current Director Defendants Byrnes, Connors, Elliott, Fox, Mario, Reinhardt, and Sununu—seven of the twelve directors, a clear majority—cannot be impartial with respect to a shareholder demand to commence litigation against the Board on behalf the Company to recover for the damage caused by the directors. As a result, demand is futile.

**None of the Board Members Are Impartial**

116. In addition, all of the Current Director Defendants signed the 2010 10-K, which contained the materially false and misleading statement that the employee disciplinary actions "could" hurt CRM sales. Each and every Current Director Defendant knew or should have known said statement was materially false and misleading when made, or was recklessly disregarded by them as such.

117. The dramatic breakdown and gaps in the Company's financial reporting, ethics compliance, and quality controls were so widespread and systematic that all of the Current Director Defendants face substantial exposure to personal liability. All of these directors either participated in or knew or should have known that violations of law and internal policy were occurring, or recklessly disregarded such violations, particularly in light of the many "red flag" warnings available to them, and took no steps in a good faith effort to prevent or remedy those violations, proximately causing millions of dollars of losses for the Company.

118. The fact that the CIA includes substantial, significant language imposing numerous obligations on the Company's current and future directors further reinforces the notion that the Current Director Defendants failed egregiously to act in good faith and/or to be active, informed, and engaged directors of the Company, because the government has compelled them

to perform their fiduciary duties.

119. As such, all of the Current Director Defendants face a substantial likelihood of personal liability, with the result that the entire Board lacks the ability to consider a demand impartially.

**COUNT I**

**Against The Individual Defendants**
**for Breach of Fiduciary Duty**

120. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

121. The Individual Defendants owed and owe BSC fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe BSC the highest obligation of loyalty.

122. The Individual Defendants, and each of them, violated and breached their fiduciary duties of loyalty.

123. The Individual Defendants knew they caused the Company to make materially false and misleading statements during the Relevant Period or should have known or were recklessly indifferent to the fact that they caused the Company to make such statements. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

124. By reason of the foregoing, the Individual Defendants have proximately caused injury to the Company, which has been and will continue to be substantially damaged as the foreseeable result of their wrongful acts and omissions. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

125. Plaintiff, on behalf of BSC, has no adequate remedy at law.

## COUNT II

**Against The Individual Defendants**
**<u>for Breach of Fiduciary Duty</u>**

126. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

127. Based upon the allegations set forth in the preceding paragraphs, the Individual Defendants intentionally and/or recklessly breached their fiduciary duties and aided and abetted one another in breaching their fiduciary duties to the Company, and/or failed to implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors and employees of BSC from violating or acting in contravention to, applicable legal requirements.

128. Those Individual Defendants who participated in or had knowledge of the Company's illegal activities and profited thereby acted intentionally, thereby breaching their fiduciary duty of loyalty to the Company.

129. The Individual Defendants who were directors and/or senior executive officers of the Company abused the trust reposed in them by virtue of their positions and breached their fiduciary duty of loyalty by utterly abdicating their duty of oversight. As the result of their sustained and systematic failure to exercise oversight, the Individual Defendants caused or allowed the Company's business to be conducted in violation of the extensive legal requirements and regulations that were known or should have been known to them.

130. By reason of the foregoing, the Individual Defendants have proximately caused injury to the Company, which has been and will continue to be substantially damaged as the foreseeable result of their wrongful acts and omissions. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

131. Plaintiff, on behalf of BSC, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Declaring that the directors and officers named as Individual Defendants herein have breached their fiduciary duties as alleged herein;

B. Requiring the Individual Defendants to pay to the Company the amounts by which it has been damaged or will be damaged by reason of the conduct complained of herein;

C. Requiring the Individual Defendants to remit to the Company all of their salaries and other compensation received for the periods when they breached their duties;

D. Ordering that the Individual Defendants and those under their supervision and control, refrain from the commission of such further unlawful activities as are alleged herein, and implement comprehensive corrective measures including a system of internal controls and procedures sufficient to prevent the repetition of the acts complained of herein which will rectify all such wrongs as have been committed and prevent their recurrence;

E. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 21, 2010

Plaintiff Rick Barrington,
By his attorneys,

**/s/Theodore M. Hess-Mahan**
Theodore M. Hess-Mahan, BBO #557109
Hutchings, Barsamian, Mandelcorn
& Zeytoonian, LLP
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
(781) 431-2231
thess-mahan@hutchingsbarsamian.com

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
Marc A. Rigrodsky
919 N. Market Street, Suite 980
Wilmington, DE 19801
Tel.: (302) 295-5310
Fax: (302) 654-7530

**LAW OFFICES OF**
**BRUCE G. MURPHY**
Bruce G. Murphy
265 Llyds Lane
Vero Beach, FL 32963
Tel.: (772) 231-4202
Fax: (772) 231-0664

***Counsel for Plaintiff***